(45 Misc. Rep. 278.)

MORRIS v. HUGHES et al.

(Supreme Court, Special Term, New York County. November, 1904.)

TRUST—EVIDENCE TO ESTABLISH—ACCOUNTING.
    An old and feeble woman, competent to exercise a sound judgment as
    to her affairs, gave about $5,000 in savings-bank drafts to one on his oral
    promise to pay the expenses of her support as long as she lived, and her
    debts and funeral expenses, and to pay $3,000 to a certain church, $1,000
    of which was to be used for masses for the repose of her soul, and the
    remainder to the support of a third person. Held to create a valid trust

in the fund, entitling such person to sue in her individual capacity for an accounting, but not to maintain an action as to the trust in her capacity as administratrix.

Action by Ellen Morris, administratrix, against John T. Hughes and others, for an accounting. Dismissed.

Louis Karasek, for plaintiff.

Charles N. Deshon, for defendants.

GILDERSLEEVE, J. In October, 1902, one Jane Morris died intestate in the borough of Manhattan and city of New York. For about 3 years prior to her death she had lived with one Ellen Morris, the widow of her deceased brother, at No. 131 West Sixtieth street. At the time Jane died she was at least 90 years of age. Ellen was somewhat younger—perhaps 15 years younger. Their home was in a basement, for which a monthly rent was paid of $5, and their condition was apparently one of extreme poverty. About seven or eight weeks before Jane's death the Reverend John J. Hughes, of the Church of St. Paul the Apostle, situated in West Fifty-Ninth street, and his nephew, one John T. Hughes, a janitor in the employ of the Spaulding Literary Association, one of the defendants in this action, being interested in the welfare of Jane, and realizing that she was in a very feeble condition and had but a short time to live, were instrumental in causing her removal to No. 139 West Sixtieth street, where she had better accommodations. Earlier in life Jane had been acquainted with Father Hughes and the said John T. Hughes, and was more or less attracted to them in her last days by reason of this earlier acquaintance. About the time of the removal, as we have seen, to No. 139 West Sixtieth street, the said John T. Hughes assumed the responsibility of taking care of Jane, and, to this end, employed a physician and one Mary McCartney to administer to her wants. From this time to the time of Jane's death the said John T. Hughes was much of the time at her home both day and night, ostensibly for the purpose of giving her proper care and attention.

It is the claim of the plaintiff, Ellen Morris, that, in her individual capacity, she had furnished food, lodging, and clothing to Jane, and performed services for her, during a period of about three years prior to the time the said John T. Hughes assumed the responsibility above stated, and that the said Jane had, for value, agreed to pay her, the said Ellen, therefor, and that upon the death of Jane the latter was indebted to her, the said Ellen Morris, in the sum of $5,060.18. This amount was the saving of the lifetime of Jane, and constituted her entire estate, and, at the time of her removal with Ellen to the premises where she died, it was on deposit in various savings banks to the credit of the said Jane Morris. About the time of the removal of said Jane, as above stated, the sum of $150 was drawn from one of the savings banks, upon a draft duly executed by said Jane Morris, for the purpose of paying rent and purchasing necessaries for her care and comfort. A portion of said sum was expended in said purchases, and a portion thereof was paid to Ellen Morris on account of money expended or to

be expended for a like purpose. On September 25 and 26, 1902, the entire sum on deposit in the various savings banks, amounting, as aforesaid, to $5,060.18, was drawn from said banks by the said John T. Hughes upon drafts executed by Jane to the order of the above-named Mary McCartney. The acknowledgment of Jane to the execution of said drafts was taken by said John T. Hughes, acting in the capacity of notary public. The money was carried by the said John T. Hughes to the Emigrants' Savings Bank, where $3,000 thereof were deposited to his individual credit, and the balance, amounting to upward of $2,000, was deposited to the credit of said Mary McCartney. The said John T. Hughes retained possession of both bank books. Before Jane died the said John T. Hughes transferred and delivered $3,000 of said money to the Missionary Congregation of St. Paul the Apostle. Two thousand dollars of said sum the said Missionary Congregation gave to the Spaulding Literary Union, which is an unincorporated association of more than seven members, and an organization in which the Missionary Congregation took great interest. As we have already seen, John T. Hughes was the janitor in the employ of said Spaulding Literary Union. The bulk of the balance of the money the said John T. Hughes claims he expended in taking care of said Jane, i. e., in the purchase of necessary articles, including food, clothing, and medicines, doctor's bills, nurse hire, and his own salary, funeral expenses, and in a present to Ellen Morris of the sum of $455.

The account of expenditures, as given by John T. Hughes upon the trial, was very imperfect and unsatisfactory, and the true balance remaining in his hands is left in much doubt. It is the claim of the said John T. Hughes that Jane gave him this money under instructions to pay $3,000 thereof to the Missionary Congregation of St. Paul the Apostle, of which $2,000 were to be used as said congregation might deem proper, and $1,000 thereof were to be used in payment for masses to be said for the repose of her soul; that from the fund the expenses of Jane were to be paid as long as she lived; that after her death her debts and funeral expenses were to be paid, and all money remaining was to be his. He swore the money was given to him in trust, to do with it as Jane directed.

Much embarrassment in the disposition of this case arises from the indefinite character of the complaint. It will be observed that this action is by Ellen Morris, as administratrix of the goods, chattels, and credits of Jane Morris, deceased, and that the recipients of the $3,000 and John T. Hughes are the defendants. The trial proceeded upon the theory, urged by the learned counsel for the plaintiff, that there never was a valid transfer of the money in the banks, by reason of the alleged fraud and undue influence exercised upon Jane in procuring the execution of the drafts upon which the money was drawn. The relief demanded is that said drafts be declared void, and the money adjudged to belong to the estate of Jane Morris; that said John T. Hughes, the Missionary Congregation, and the Spaulding Literary Union be required to account to the plaintiff, and to pay and deliver to her the entire amounts which they have received. All the other causes of action that may be said to be set up in the complaint were abandoned at or

before the close of the trial.   It would require much space to go over the details attending the execution of the drafts.   Irregularities appear, not fully explained or readily defended.   Something might well be said in criticism of the conduct of John T. Hughes from the time he assumed care of Jane down to the conclusion of the trial.   I consider it sufficient, however, to state the conclusions I have reached after a careful consideration of a mass of conflicting and contradictory testimony, without mention of more than the principal portions upon which I rely.

I wish to say at the outset that there is no evidence in the case that reflects in the slightest degree upon the good name or character of the Reverend Father John J. Hughes.   The conduct of Father Hughes throughout, as disclosed by the evidence, was that of a pure and holy man, looking after the spiritual welfare of Jane Morris, in the discharge of his duty as a faithful priest.   That Jane parted with all her money before her death, and that it all went into the possession of the defendant John T. Hughes, there can be no doubt.   I think it clearly appears, by a substantial preponderance of proof, that the transfer of the money from the banks to John T. Hughes was a valid transfer.   The drafts were accompanied by a delivery of the books.   The effect of the execution and delivery of the drafts was fully explained to Jane by Dr. James Began, a physician of 27 years' practice and of high repute, whose credibility as a witness is in no way impeached.   It must be held that Jane understood the nature of her act in this regard.   Dr. Began testifies that he told her that, if she gave John T. Hughes the authority to draw the money, he could use it for himself; that she would not have a cent she could call her own; and that Jane said she wanted John T. Hughes to have the money, as he knew what to do with it.

It is more difficult to say with certainty just what instructions Jane gave to John T. Hughes as to the disposition of the money.   On September 15, 1902, somewhat more than five weeks before the death of Jane Morris, she made and executed a will.   The testimony shows that it was subsequently destroyed, and the torn pieces are produced in evidence.   These pieces have been so arranged that the exact text of the will is now before me in typewritten form.   It appears, as we have seen from the testimony, that Jane was very old and feeble and gradually declining; but the claim that she was of unsound mind and incapable of disposing of her property at the time she made the will and at the time she executed the drafts was abandoned upon the trial.   I think this claim of the plaintiff was very properly abandoned, for, from the evidence, it is very clear to my mind that she was fully competent to exercise a sound judgment as to the disposition of her property, and understood the nature of her act when she executed the will and the drafts.   I give great weight, therefore, to the expressions in the will as indicating at that time her wishes as to the disposition of her property. Although it must be said that she subsequently destroyed the will, the conditions under which it was made continued about the same until the drafts were drawn and the money obtained thereon by the said John T. Hughes; and, on the question as to what she intended John T. Hughes to do with her money, the language of the will is very potential.   No reason appears for any great change in the disposition of her

property between the time of the execution of the will and the execution of the drafts. By the fourth clause of the will Jane bequeathed to the Reverend Father John J. Hughes the sum of $2,000 for his personal use and benefit. It is in evidence that, when Father Hughes learned of this bequest, he declined to accept it; that Jane was informed that he, as a priest of the Roman Catholic Church, could not receive a sum of money for his personal benefit; and that, upon learning of this refusal of Father Hughes to accept the money, Jane said she would give it to the church. The third clause of the will provides that the sum of $1,000 be given as an offering for masses to be celebrated by the Reverend Father John J. Hughes for the repose of the soul of said Jane Morris.

In view of the religious faith in which Jane had lived, and in which she evidently intended and hoped to die, this expenditure of $1,000 for masses is not at all an unnatural or unreasonable one, especially as the evidence tends to show that she believed in her last years that she had no blood relatives living. It is true that upon the trial one Maria Judge was called, and testified that she was a cousin of the said Jane Morris; but, for aught that appears, there is no reason to believe that Jane was aware of the existence of such a person during the period of her last illness, or for many years prior thereto. Father Hughes had been very kind and good to Jane, and for three years prior to her death had visited her as often at least as once in six weeks, and administered to her the holy sacrament. It is very easy to believe that Jane must have felt a warm appreciation of the kindness extended to her by Father Hughes during a long period of time, and that she entertained a profound esteem for him, as well as a deep love for the church in which she was a communicant. Her sister-in-law, Ellen Morris, with whom she lived for upward of three years, and of whom she had seen more or less for many years, was an old woman, who for a long time had lived on very little, and was able to continue in so doing, and not likely to want that little long. These considerations, based upon the evidence, and the evidence fairly weighed, coupled with the reasonable probabilities, incline me to the conclusion that the money in question was delivered to John T. Hughes with instructions as to the uses and purposes to which it was to be applied, and with which instructions said John T. Hughes promised to comply, and that the circumstances under which the money was received by said John T. Hughes created a valid trust, placed the fund beyond the control of Jane Morris, and vested the title to it in the said defendant John T. Hughes as trustee. The delivery of the property was sufficient to pass the title. See Gilman v. McArdle, 99 N. Y. 451, 2 N. E. 464, 52 Am. Rep. 41, and cases there cited.

I think John T. Hughes received the money on terms stated by the deceased, and promised to apply it as directed by her. The beneficiary of such portion of the fund as has not been lawfully expended for the uses and purposes directly by the deceased is Ellen Morris. The evidence satisfies me that the uses and purposes for which the money was given to John T. Hughes included the reasonable expense of the care, support, and treatment of the deceased as long as she lived, the pay-

ment of all her debts and funeral expenses, the payment of $3,000 to the Missionary Congregation of St. Paul the Apostle, $1,000 of which was to be used in payment for masses, and that the residue and remainder, both principal and income thereof, were to be devoted to the reasonable support and maintenance of the said Ellen Morris in such amounts and at such times as might be reasonable and necessary for that purpose. The will provided that Father Hughes should become trustee of the fund of which Ellen Morris was to have the benefit, and when the will was destroyed, and the money placed in the hands of John T. Hughes, as we have seen, I think that upon John T. Hughes was imposed the responsibility of executing substantially the same obligations that had been imposed upon Father Hughes by the terms of the will. There is much in the conduct of John T. Hughes to support this conclusion. Some things were done with the money for the benefit of Ellen, such as the purchase of clothing at the time of Jane's death, and the gift to her of some money before Jane died. I regard the sending for Ellen by said John T. Hughes after Jane's death, and the turning over to her of practically all the money that remained, according to the claim of John T. Hughes, as an indication that John T. Hughes realized an obligation on his part to give Ellen the benefit of all that remained. In my opinion, the evidence does not support the claim of the plaintiff that there never was a valid transfer of the money from the banks.

I hold that the money was given by Jane Morris to John T. Hughes on the promise by him to use it as she directed; that the directions she gave were, as nearly as can be determined from the evidence, as I have above indicated; that the transaction between Jane and John T. Hughes constituted a valid agreement; that Ellen Morris is the only beneficiary interested in the completion of the agreement, and can now enforce it as a trust. I think this conclusion violates no law, and that it is fully in accord with the principles laid down in Gilman v. McArdle, supra. Under the circumstances, the legal representative of Jane has no cause for action. John T. Hughes should render to Ellen Morris a strict account of all moneys expended, and apply the balance, to wit, the principal thereof and the income therefrom, to the reasonable support and maintenance of Ellen Morris, in such amounts and at such times as her necessities may require. In this action, however, brought by Ellen as administratrix of the goods, chattels, and credits of Jane Morris, deceased, the rights of Ellen as an individual cannot be adjudicated. The complaint must be dismissed as to all the defendants, and, under the circumstances, without costs to any of the parties.

Complaint dismissed, without costs.